IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (EL PASO)

UNITED STATES OF AMERICA, . Case No. 3:26-cr-01028-KC-2
.
Plaintiff, .
.
v. .
.
JONATHAN GUEVARA, .
ALSO KNOWN AS PANTERA, .
.
Defendant. .
. Tuesday, April 7, 2026
. . . . . . . . . . . . . . . . . 10:52 A.M.

FILED
May 21, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Diego Cesena
DEPUTY

TRANSCRIPT OF CONTINUED PRELIMINARY AND DETENTION HEARING
BEFORE THE HONORABLE ANNE T. BERTON
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

For the Plaintiff: United States Attorney's Office
BY: MATHEW ENGELBAUM, ESQUIRE
700 East San Antonio Avenue, Suite 200
El Paso, Texas 79901

For the Defendants: Benjamin Law Firm
BY: ART WERGE, ESQUIRE
1013 East San Antonio Avenue
El Paso, Texas 79901

For the Interpreter: J. Vaughn

Deputy Clerk: Myrna Gallegos
United States District Court
525 Magoffin Avenue, Suite 105
El Paso, Texas 79901

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

INDEX


| | PAGE |
|---|---|
| Case called | 3 |
| Arguments on Probable Cause | |
| By: Mr. Engelbaum | 22 |
| By: Mr. Werge | 23 |
| By: Mr. Engelbaum | 24 |
| Court's Ruling on Probable Cause | 25 |
| Arguments on Government's Motion To Detain | |
| By: Mr. Engelbaum | 26 |
| By: Mr. Werge | 28 |
| Court's Ruling on Government's Motion To Detain | 30 |
| End of Proceedings | 32 |
| Certification of Transcriber | 33 |

WITNESSES FOR THE GOVERNMENT:

| | |
|---|---|
| AGENT CARRERA | |
| Cross-Examination by Mr. Werge | 4 |
| Redirect Examination by Mr. Engelbaum | 14 |
| Recross-Examination by Mr. Werge | 19 |

WITNESSES FOR THE DEFENDANT:

(None)

| EXHIBITS: | Marked | Admitted |
|---|---|---|

EXHIBITS FOR THE GOVERNMENT:

(None)

EXHIBITS FOR THE DEFENDANT:

(None)

**EL PASO, TEXAS, TUESDAY, APRIL 7, 2026, 10:52 A.M.**

COURTROOM DEPUTY: All rise.

THE COURT: Good morning. Please be seated. We're back on the record in EP:26-CR-1334 in this case against Jonathan Guevara. We're going to continue the hearing.

May I have announcements again, please?

MR. ENGELBAUM: Mathew Engelbaum for the United States.

THE COURT: Thank you.

MR. WERGE: Art Werge for Jonathan Guevara, Your Honor.

THE COURT: All right. So we had the agent on the stand. If we can get him back here. Okay, thank you, Agent. Remember you're still under oath.

THE WITNESS: Yes, ma'am.

THE COURT: Please have a seat.

THE WITNESS: Yes, ma'am.

THE COURT: Thank you. And I believe that Mr. Engelbaum had finished his questioning. Is that right?

MR. ENGELBAUM: Yes, Your Honor.

THE COURT: Okay. Mr. Werge, go ahead.

MR. WERGE: Thank you.

THE COURT: Thank you.

AGENT CARRERA, GOVERNNMENT'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION

BY MR. WERGE:
Q Good morning, sir.
A Good morning, sir.
Q Sir, I want to start off, are you familiar with the amended criminal complaint in this case that has been signed by HSI Agent Samuel Day?
A Yes, sir. I am.
Q And have you reviewed this?
A Briefly, sir. Yes, sir.
Q Is this affidavit true and correct?
A Yes, sir. It is.
Q All right. Do you adopt it as true and correct?
A I do, sir.
Q All right, sir. So the first glaring issue that comes up, sir, is that the dates on the very first page are alleging March 1st of 2023 to March 30th, 2026. So you would agree with me that's a three-year period of the alleged acts in question?
A Yes, sir.
Q All right. So other than that, there's no other evidence that goes back beyond those three years in this affidavit, correct?
A That's correct, sir.
Q Okay.
A From that affidavit.
Q Yes, sir. Okay. And this is all we have. This is what

you've given us.
A Correct.
Q All right, sir. And you were present when this took place? You were present during the interrogation of Mr. Guevara?
A Yes, sir. I was.
Q All right. Now Mr. Guevara never stated that he personally transported any unaccompanied children within the U.S. Is that correct?
A That's correct, sir.
Q All right, sir. The entire description of his conduct in this affidavit that you've adopted is based on his brief statements on the date of his arrest, correct?
A For this criminal complaint, yes, sir. That's correct.
Q All right. And his statements are with respect to possible acts that took place in Juarez, Mexico. Correct?
A That's correct.
Q All right, sir. And, sir, are you aware that the law requires acts or omissions within the U.S.?
A That's correct, sir. And the acts that occurred in Mexico are --
Q We'll get to that. We'll get to that, sir.
A Sure thing. Yes, sir.
Q Yes, sir. No, I appreciate it. Thank you.
Now, you have no evidence in this affidavit that

Mr. Guevara was seen transporting unaccompanied children in El Paso, Texas.

A That's correct.

Q All right. And you have no evidence of physical evidence that he was picking up children within the U.S.?

A That's correct.

Q All right. The statement that you accuse him of is that he may have taken children to his mother's house in Juarez. Is that correct?

A Providing children to the Guadian family.

Q Well, it says here to his mother in Juarez. Is that incorrect?

A It could have been that he provides them to the mother, but then also that he takes them and he coordinates for them to end up at the Guadian family.

Q Okay.

A So, you know what? He might have been giving them to the mother, but then subsequently they follow up with the Guadian family.

Q And very importantly, you used the word "might have," right? Because you personally did not observe that.

A Correct. He informed us of it.

Q Right.

A Correct.

Q In Mexico.

A Correct.
Q All right. Is taking children to his mother's house in Mexico a crime in the U.S.?
A No, but he informed us --
Q That's fine, sir. Okay.
THE COURT: Mr. Werge, let him finish his answer.
MR. WERGE: Yes, ma'am. I apologize.
THE COURT: Go ahead.
THE WITNESS: Yes, sir. But he informed us that he knew that the children were illegal aliens and that they were going to be crossed over into the United States through the interview.
BY MR. WERGE:
Q He informed you that the children --
A Correct.
Q -- were illegal aliens?
A Correct.
Q All right. How can Mexican children be illegal aliens in Mexico, sir?
A Correct. Not illegal aliens in Mexico.
Q All right.
A But soon-to-be illegal aliens going to be used to be transported over into the United States.
Q That's what you believe happened?
A That's right.

Q All right. Now, these alleged four unaccompanied children, do you know their names?
A I do not.
Q Do you know their initials?
A No, I do not.
Q Do you have any identity documents for them?
A I don't.
Q Do you have photographs?
A I do not.
Q All right. Do you have any evidence of these alleged four children being in the presence of Mr. Guevara?
A I do not.
Q All right. Now, you state that there were Facebook messages involved in this case.
A Correct.
Q And you got that from Ms. Aguilar?
A And Mr. Guevara, sir.
Q Okay. Now, have you personally seen Facebook messages created by Mr. Guevara that are relevant to this case?
A I have not.
Q All right. Have you seen any social media messages created by Mr. Guevara that are relevant to this case?
A I have not, sir.
Q Okay. Have you even seen a social media account in his name?

A Not in his name, no.
Q Okay. Have you seen a Facebook account with any information concerning him?
A Yes, I have.
Q All right. But that was not criminal information, right? That's basic Facebook information?
A Well, there's a Facebook post from his daughter that mentions him as Pantera.
Q All right. And is being possibly named Pantera or Guero or Chico a crime?
A No, but it -- not in itself. It's not, you're right. But when you have a narcocorrido singer making a song and it mentions Pantera on it and it alludes to smuggling illegal aliens, it just adds to it. I'm not saying that's a crime, sir. You're right.
Q Okay. But now what you're saying is that there's actually a narcocorrido about Mr. Guevara?
A We've heard that from different cooperators, sir.
Q Have you personally heard this supposed narcocorrido?
A I have.
Q Okay. And if somebody makes a narcocorrido, how much does it cost to get a narcocorrido song made?
A I wouldn't be able to even know. I've never -- but I wouldn't think it's less than $10,000. It would probably be more.

Q Well, do you know?
A I don't.
Q Okay. And is that part of the 1324 charge that there's a narcocorrido? Is that an element?
A That's not.
Q Okay. Is the name Pantera an element of the 1324?
A We've heard Pantera through multiple interviews that the United States Border Patrol has conducted and advising that they were -- they contracted a smuggler by the moniker of Pantera. We followed up and there's a case recently in 2026 where we do conduct a search warrant on an address in Mountain in El Paso, Texas linked back to what the illegal alien informed us of, that he hired a smuggler by the moniker of Pantera and that address is on Mountain Street --
Q Okay.
A -- in El Paso, Texas.
Q So are you telling the judge that any Pantera in this alleged narcocorrido is in fact Mr. Guevara?
A No, sir. But we did have a female that is his stepdaughter show up to that address when the search warrant was being executed.
Q Why is showing up in an address relevant, sir?
A It's not, sir.
Q Okay.
A But it just helps us understand that they might all be

linked together, sir.

Q Sure. Sure.

A That's what helps us as law enforcement.

Q And just to be clear, you are alleging that my client conspired to transport aliens within the U.S., correct?

A That's correct.

Q All right, sir. And you understand that that's got to be within the U.S., correct?

A Well, we understand that you can conspire to transport illegal aliens outside of the U.S. --

Q Okay.

A -- by being a provider, by benefiting, getting payment for it because you're part of the conspiracy. It's a conspiracy to transport illegal aliens.

Q Excellent. Let's go into payment.

A Sure.

Q What evidence do you have that Mr. Guevara has received any payments in connection to transporting illegal aliens in the U.S.?

A He informed us that he would charge $1,200 to smuggle an illegal alien.

Q Why is that not in your affidavit, sir?

A I don't know, sir.

Q Because that's in your affidavit that Defendant 1 said --

A No, no, sir, if I may. Defendant 1 said it was $3,000.

Q Okay.
A Your client said it was $1,200.
Q He said it was $1,500?
A 1,200 to 1,100, if I'm not mistaken.
Q And he said that he received that?
A That's how much he would charge to smuggle an illegal alien.
Q And do you have any evidence that he actually received that money?
A I do not.
Q Okay. Do you have any bank account statements that show unexplained wealth?
A I don't, but I do have, I guess, circumstantial evidence you could call it, of things that we could see that probably don't jive with, you know, he informed us he was a construction worker getting paid $400 a week for construction, but he has recording artists, narcocorrido recording artists at his address in Juarez, you know, for quinceaneras, which kind of doesn't jive. And he has Mercedes Benz G-wagons at his house.
Q Okay. So all these pieces of information you provided, you agree are not in your affidavit?
A That's correct, sir.
Q All right. So, let's just go back. You've already testified that there are no Facebook Messenger connected to Mr. Guevara that support the conspiracy. Is that correct?

A That's correct. He informed us of that, sir.
Q Okay.
A He informed us that, you know, it was both him and his wife.
Q Now, you state there's a G-wagon.
A Correct.
Q Okay. And the G-wagon is an expensive Mercedes Benz SUV?
A That's right.
Q And what year is this G-wagon?
A I believe he told us it was around 2020.
Q All right. Did you see it?
A Yes, sir. I have seen it.
Q Where is it?
A I've seen it while we were conducting our investigation years past. It used to be parked at St. Louis Street, if I'm not mistaken, near the old --
Q Years past? Okay. What year, sir?
A I would want to say 2023, 2024.
Q All right. So, in March of 2026, do you have any evidence that Mr. Guevara owned a Mercedes Benz G-wagon?
A Yes, he informed us that he used to own it.
Q He informed you of that?
A Yes, sir. He did.
Q Used to own it?
A Used to. He sold it.

Q Okay. Now, do you have any evidence that that was acquired with illicit funds?
A I do not, sir.
Q Okay. Very good. Now, you keep bringing up this narcocorrido, sir. Do you have any evidence that Mr. Guevara sponsored a narcocorrido on his behalf?
A I do not.

MR. WERGE: All right. Thank you, Your Honor. I pass the witness.

THE COURT: Mr. Engelbaum, any other questions?

MR. ENGELBAUM: Just briefly, Judge.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. ENGELBAUM:

Q Agent, in the interviews that you've done with the Guardians and other apprehended smugglers, did they mention successful smuggling trips?
A They did.
Q Give or take, amongst all of these people, how many unaccompanied children would you say that they've successfully smuggled?
A We recently apprehended a tender age, unaccompanied alien child smuggler yesterday, and she advised us that she had been offered 100 unaccompanied alien children, she would estimate, in the two years that she was working with the Guadian family.

And she advised that of those 100 that she got offered, she was successful in smuggling at least 30 to 40 of them. And that's just one smuggler.

Q And were those smuggling attempts, were they occurring in the Western District of Texas?

A Yes, sir. Through the Paso del Norte Port of Entry.

Q First, just to clarify, what's a narcocorrido?

A Narcocorrido is a ballad done by a singer in -- you know, any singer, traditionally in Mexico who makes a song talking about the lifestyle, about the flashiness, about the subculture world of narcotics and alien smuggling.

Q How long have you been investigating transnational criminal organizations for?

A About 18 years, sir.

Q Is this a pretty common thing, this narcocorrido?

A No, sir, it is not.

Q Why do you say that?

A Usually whenever a smuggler is pretty successful in the craft of alien smuggling, or I guess industry of alien smuggling, and he arises, he wants to show his competition and he's able to stay afloat and he's been successful at what he's doing.

Q The song itself, you've heard the song?

A Yes, sir, I have.

Q Does it say Jonathan Guevara in the song?

A It does not.
Q What does it say?
A It says Pantera. It talks about a brother that passed away. It talks about smuggling emplumados, or basically feathered, which alludes to pollos, which is a common moniker or name for aliens that are getting smuggled in between the port of entry.
Q You mentioned a Facebook post --
A Yes, sir.
Q -- by a family member. Can you tell us about that?
A Yes, there's Jonathan Guevara's stepdaughter advised that -- post that something alluding that Luis Erik Enriquez (phonetic) went to an afterparty and then his live-in wife, Ms. Anel Guevara, says oh, probably the best smuggler in El Paso, Juarez. And then the daughter states oh, yeah, it's probably -- they say that it's somewhat a guy by the moniker of Pantera.
Q You mentioned another name, Luis. Who's that?
A Luis Erik Enriquez?
Q Who's that, yeah?
A He's an narcocorrido singer, based out of Guadalajara now, I believe.
Q But he's the singer who made this song?
A That's correct.
Q You mentioned having someone come to Defendant Guevara's address to perform?

A Yes, that's right. From what we had learned from Mr. Guevara was that after the (indiscernible) in Ciudad Juarez two, three years -- three, four years ago, Luis Erik Enriquez ended up at a terraza, which is a party hall, what have you, to continue the afterparty and singing at the house.

Q And Defendant Guevara told you this?

A Yes.

Q He told you he hired this Luis guy?

A No, he said that they wanted to continue. He didn't charge him. From what we learned from his wife was that Luis Erik Enriquez's manager is I guess somewhat of a family member to Jonathan Guevara. And she also mentioned that Luis Erik Enriquez had composed another song (indiscernible). She admitted that that one was done for them.

Q When you say it now, do you mean Defendant Perez?

A Correct, Defendant Perez. Correct.

Q You mentioned the Mountain Avenue address?

A Correct.

Q What happened there?

A There was a search warrant conducted based on an investigation being done by HSI and U.S. Border Patrol. And they ended up apprehending some subjects and some illegal aliens at that address.

Q And you mentioned a family member of Defendant Guevara showed up?

A Correct.
Q Were they living there?
A Not to the best of my knowledge. I understand that a boyfriend of hers was arrested at that address.
Q Okay. And which family member, I guess, showed up to this Mountainview Avenue address after the search warrant was executed?
A It was going to be his other stepdaughter by the name of Jimena Aguilera (phonetic).
Q You mentioned the G-wagon. You mean a Mercedes G-wagon?
A That's correct.
Q What did he tell you in the interview about the G-wagon?
A He said that he purchased that one from the dealership. It was quite expensive. And so that one was a vehicle that he purchased.
Q How long ago did he purchase it, did he tell you?
A He didn't. I would say it was '21, 2020, I would imagine a while back.
Q And then he sold it recently, he told you?
A He did.
Q Did he tell you what year, give or take?
A I'd say last year sometime, he said he sold it.
Q Did he mention how much money he got out of it when he sold it?
A I believe nearly around $100,000, I believe. Or I don't

know if that's how much he paid for it, but he made somewhere near $100,000 after he sold it.

MR. ENGELBAUM: I pass the witness, Your Honor.

THE COURT: Mr. Werge?

MR. WERGE: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. WERGE:

Q All right, sir. So you've testified that the Guadians are involved in the smuggling of unaccompanied alien children.

A That's correct.

Q And I think you testified that you've arrested the Guadians.

A Correct.

Q And that they have heavy involvement in this case.

A That's correct.

Q And perhaps that's where your case gets strong because of the Guadians. Correct?

A You can say that. Yes, sir.

Q All right. And you picked up quite a bit of evidence from the Guadians?

A That's right.

Q All right. You have their cell phones?

A Yes.

Q All right. And you have whatever books and papers they had?

A Correct.
Q All right. Anything on the cell phone with the Guadians that identifies my client?
A There is -- not your client, but there is Facebook posts where Anel likes Guadians' posts or they like each other's Facebook posts.
Q Regarding my client, there's nothing about my client?
A Correct.
Q All right. Regarding the papers, ledgers, books that the Guadians had in connection to their smuggling scheme, there's nothing there that references my client. Correct?
A Correct.
Q All right. Now, you also mentioned a recent arrest. Correct?
A Correct.
Q All right. And in that recent arrest, sir, did you pick up any physical evidence that links my client to the scheme?
A No, sir.
Q All right. Okay. And what kind of vehicle does my client own right now?
A When we went to his address, he had a GMC Yukon, newer model, 2020 and forward because it's a new base, a Dodge SRT Hellcat. And we did also see another Mercedes that I believe his other stepdaughter, Jimena, was driving.
Q All right. So let's just be clear. Right now, you

testify, my client owns a GMC pickup?
A GMC Yukon, sir.
Q GMC Yukon.
A Yes, sir.
Q And he owns a Hellcot?
A Hellcat Dodge Charger.
Q Okay. And those are --
A It's a Dodge Charger, but it's a Hellcat branded one.
Q All right. When you ran his records through your database, how many vehicles did you identify that he owns right now?
A I didn't run his records right now. Right now.
Q All right. Now, you were present in his house for anywhere from half an hour to an hour?
A Yes, sir.
Q All right. Did you find any ledgers?
A I did not, sir.
Q All right. On his cell phone, does he have photos of unaccompanied children?
A No, sir.
Q Okay. Did you find any unexplained amounts of cash in his house?
A No, sir.

MR. WERGE: Okay. Thank you. Pass the witness, Your Honor.

THE COURT: Mr. Engelbaum, any other questions for the witness?

MR. ENGELBAUM: No, ma'am.

THE COURT: Okay. Agent, you may be excused. Thank you very much.

THE WITNESS: Thank you, ma'am.

(Witness excused)

THE COURT: Mr. Engelbaum, let me hear arguments regarding probable cause at the podium.

MR. ENGELBAUM: Yes, Your Honor. The Court heard the testimony of Agent Carrera regarding, working backwards, we have the statement of Defendant Guevara, who admits, I think he provides a minimized statement of what his involvement was, but he does admit, I personally provided four children to be smuggled while I was in Mexico, to be smuggled into the United States. Admits to his involvement, payments, and how much he would charge.

Again, I think he provides a minimized version of these events and says it was years ago. The Co-Defendant, his spouse, also further implicates him. I think she also provides a minimized statement, but she provides a little bit more and implicates the Guadian family, which the Defendant himself mentions in his post-arrest interview. So we ask the Court to find probable cause.

As to the conspiracy to transport, we have the

Defendant's statement coupled with multiple apprehensions of the Guadian family members who've, now again, the Court can consider their cooperation for what that's worth, but have advised that they have successfully smuggled hundreds of aliens in connection with this Defendant and the Co-Defendant. And we ask the Court to find probable cause.

THE COURT: Mr. Werge?

MR. WERGE: Thank you, Your Honor.

So, Your Honor, the Fifth Circuit Jury Instructions tells us that in order to convict this Defendant or find probable cause, that Mr. Guevara must have transported, moved, or attempted to transport or move an unaccompanied child within the U.S. Nothing like that happened. There is perhaps a stray remark that he took perhaps some children to his mother's house.

The agent very clearly testified that there's nothing in the Facebook messages, there's nothing in his cell phone, there's nothing in the Guadian's cell phone, papers, books, or ledgers, and there's nothing in the recent arrestee connected to apparently, this scheme linking this to Mr. Guevara. So, they're trying to bootstrap a stray remark to fit the requirements of the law and there's no direct and substantial relationship to what he may have done in Juarez, who knows when, to offenses occurring here.

There's no evidence of a conspiracy because the agent

again testified, Your Honor, that neither the Guadians who appear to be central to this conspiracy, by his own testimony, nor the most recent arrestee had any ties, links, or connections with Mr. Guevara.

The extraneous remarks cloud the field. This thing about narcocorrido has no relevance. About a possible G-wagon has no relevance. In fact, if he owns a GMC Yukon or he owns some kind of Charger vehicle, it's not evidence that any crime has been committed. So, I ask Your Honor to find that there's no probable cause in this case. Thank you.

THE COURT: Thank you.

Your response, Mr. Engelbaum?

MR. ENGELBAUM: Judge, as to the conspiracy, I think we have some -- we have overlaps here in the United States. Again, it's based on cooperators, but it's confirmed by the Defendant himself and his involvement in that. He expresses that he knows knowledge about this ongoing conspiracy.

I don't believe the Defendant needs to be physically present in the United States for a conspiracy to be found here, as long as it's -- there's some connection to the Western District of Texas, which here we've got the apprehensions at the ports of entry here in the Western District of Texas.

THE COURT: All right. I'm going take a recess. We'll be in recess.

COURTROOM DEPUTY: All rise.

(Recess at 11:19 a.m., recommencing at 11:29 a.m.)

COURTROOM DEPUTY: All rise.

THE COURT: Please be seated. We're back on the record in this preliminary and detention hearing, hold on just one second, in EP:26-1334. This is versus Jonathan Guevara.

May I have announcements again, please?

MR. ENGELBAUM: Mathew Engelbaum for the United States.

THE COURT: Thank you.

MR. WERGE: Art Werge for Jonathan Guevara, Your Honor.

THE COURT: Thank you.

And I am going to find that there is probable cause. This is a conspiracy to transport aliens. The whole issue is regarding moving, conspiring to move these individuals, bringing them -- smuggling them illegally into the United States.

Given the evidence I heard earlier in the hearing moments ago, I think there's more than sufficient evidence to show that Mr. Guevara was conspiring to transport these individuals, these minors into the United States. We have evidence from the wife explaining how as part of this drug, you know, Mr. Guevara took over the alien-smuggling organization after her father died and how they were paying the cartels so that they could actually smuggle -- conduct smuggling

operations into the United States.

And then we have the corroborating evidence from the Guadian family as well as the Defense confession. So with that, I am finding probable cause.

Let me hear arguments regarding detention at the podium, Mr. Engelbaum.

MR. ENGELBAUM: Your Honor, the Government did file a motion to detain regarding Defendant Guevara.

The Court heard testimony about the ongoing nature of this conspiracy, particularly the smuggling of some of the most vulnerable unaccompanied children. There was also testimony about an event linked to the Defendant in which children were given narcotics-laced candy. The Co-Defendant and Defendant Perez denied the THC aspect of it, but did say that she did know that they were given melatonin gummies.

I think regardless, giving substances to children so that they can be successfully smuggled so that they remain quiet is an aggravating factor, and we ask the Court to consider that in determining and detaining the Defendant.

The number of children and aliens that were smuggled, again, based on cooperators, certainly acknowledge that. The testimony from Agent Carrera was that it was in the hundreds to possibly thousands, based on even just one -- the last tail end of his testimony, he mentioned just one particular member of the Guadian family who said that they were probably around 100

children that they had tried to smuggle or successfully smuggled.

I don't think the Defendant was candid in his interview with Pretrial Services. He mentions that he's lived in El Paso for about 29 years and only lived in Juarez for about 2 years, and he's lived at this address on Jerry Abbott. I think that's certainly suspect.

I think Agent Carrera testified about his crossing history checks, which would tend to indicate that he's just coming for visits and then primarily remaining in Mexico. In his statement, he does say he was in Mexico, again, when he handed off the four children that he admitted to helping smuggle into the United States.

I'll give the Court to weigh the narcocorrido for what it's worth. I think it more highlights the connections to organized crime, the aspect of the dangerousness of the community. Regular people don't have songs written about them and, again, the Government's evidence of this song being written about him is primarily based on the moniker. His name isn't mentioned and, of course, it would be the stepdaughter referencing or commenting on the videos.

The other aspect I don't think he was candid about is his employment. During the interview with Agent Carrera, he said that he was a construction worker. He does tell Pretrial Services that he worked in construction. He also mentions that

he's been working at this, I guess, a Prime Star Painting for the past eight months. Agent Carrera said there was no mention of any paint jobs or anything like that.

Regardless of whether it's construction or painting, I think it's certainly suspect that, by his own admission, he did previously own a very expensive Mercedes vehicle. Concerned considering his salary and that he also received $800 in food stamps by his own admission, how he's able to afford such a nice vehicle and other nice vehicles that the agents have observed him or have connections to.

For those reasons, Judge, we believe he is a flight risk. His role in this is simply acting as a coordinator. He could do that easily from Mexico, and he can continue to do so from Mexico. So we do believe he's a flight risk. He's comfortable in Mexico, again. And we believe that, given the totality of the circumstances of this conspiracy and the goal, he would be a danger to the community.

THE COURT: Mr. Werge.

MR. WERGE: Thank you, Your Honor.

So, Your Honor, as reflected in the Pretrial Services Report, Mr. Guevara is 31 years of age. He's a U.S. citizen. He has a criminal DWI misdemeanor when he was 18 in 2014. He did 30 days, totally compliant, no issues there. There are no failure to appears on record. There are no warrants on record.

The individual has an eighth-grade education in El

Paso. He has no history of violent crimes. He has no history of fleeing. He's totally compliant, the record by itself. There is no record of anything that he was noncompliant, that he was disrespectful when the law enforcement officers went to the house. And if we remember, Your Honor, they went to the house to arrest his wife. They did not have a warrant for him. Subsequently, they picked him up on there.

The record correctly reflects that he's been employed at Prime Star Painting for the past eight months. That was confirmed by a Pretrial Services Officer. He makes $1,600 a month, Your Honor. He qualifies for food stamps. He has four children. That's why he gets food stamps. He qualifies under the law. And his wife, as is evident here, is expecting another child. He provides for his children, provides for them.

Mr. Guevara understands that if granted a bond, he would have to stay with his sister, Jennifer, and she has no problem; that he cannot consume alcohol; consume marijuana, any substances -- he totally understands that -- that he needs to work and needs to be available for each and every time that Pretrial Services calls him. He also understands that it would be zero tolerance, Your Honor.

The statements from my friend, Mr. Engelbaum, that they think this, they think that, they think there's an narcocorrido, they think he's -- it's all suspicion. There is

no objective evidence of him being a danger. This alleged G-wagon, when the agent testified, what did you see on the records? He really doesn't know because he said he didn't pull them. He said there might have been a G-wagon maybe in '20, maybe in '21.

And I remind the Court that the alleged date in question here is March 23, 2023 to the present. So any ownership possible, which there's no evidence of, of a G-wagon is not evidence of any type of crime in this case. The agent also testified when he went into the house, there's no unexplained wealth, there's no money being stashed, there's no ledgers, there's no highfalutin conspiracy, Your Honor.

I know they have a lot of suspicion, that's their job, to be suspicious. It is. But they have to do evidence. So I ask, Your Honor, to please follow the Pretrial Services Report, provide my client a $15,000, 10-percent bond. He will appear in all the court hearings. He will be responsible. He will follow the law, Your Honor. Thank you.

THE COURT: Thank you, Mr. Werge.

Your response, Mr. Engelbaum?

MR. ENGELBAUM: Nothing additional, Your Honor, outside what we've previously argued.

THE COURT: All right. I'm going to grant the Government's motion to detain. I am finding that the Government has proven by clear and convincing evidence that

there are no condition or combination of conditions of release that would reasonably assure the safety of any other person in the community. I find that the Government has proven by preponderance of the evidence that there are no condition or combination of conditions of release that would reasonably assure the Defendant's appearance as required.

I understand Pretrial Services did recommend a bond, but obviously they didn't have the benefit of hearing all the evidence that the Court heard today. We have Mr. Guevara who appears that he's been involved in this alien-smuggling organization for a number of years now, where kids have been smuggled into the United States, given substances in order to smuggle them to the United States.

He has family in Mexico, including his mother. I know his kids are Mexican nationals. It looks like they may not have permission to be here legally, but he has family in Mexico. Although he does have a job here, it's clear that he has been working this alien-smuggling organization in Mexico.

He's also been -- while there's no criminal history, I know he's been smoking marijuana since he was 15 years old. You know, obviously in order to smoke marijuana, which is illegal here in federal court here in Texas, you have to actually possess it. And when that's done, obviously a crime is being committed and then he consumes it. So while he hasn't been caught, he has been violating the law in that way.

But I am finding that he presents a danger to the community, as well as a flight risk. For all those reasons, I am detaining Mr. Guevara.

Anything else on this case, Mr. Engelbaum?

MR. ENGELBAUM: Nothing further, Your Honor.

THE COURT: Mr. Werge?

MR. WERGE: No, thank you, Your Honor.

THE COURT: Thank you. We'll be in recess in this case, and all of you may be excused.

COURTROOM DEPUTY: All rise.

(Proceedings were adjourned at 11:40 a.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

____________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 20, 2026